================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 10
The People &c.,
          Respondent,
        v.
Urselina King,
          Appellant.


          Kendra L. Hutchinson, for appellant.
          Solomon Neubort, for respondent.


PIGOTT, J.:

          Defendant was convicted, after a jury trial, of

burglary in the first degree (Penal Law § 140.30 [3]) and assault

in the second degree (Penal Law § 120.05 [2]) for events that

occurred on March 9, 2008.  On that date, defendant and an

accomplice attacked the victim, ransacked her apartment and stole

- 1 -

$300 from her purse.  Defendant argues on this appeal that the trial court committed a mode of proceedings error when it discharged potential jurors on hardship grounds without conducting a sufficient inquiry into the particular hardship, and erred in precluding evidence of third-party culpability proffered by the defense that, according to defendant, would have demonstrated that other unidentified individuals had a motive to attack the victim.  Defendant further argues that she was deprived of the effective assistance of counsel because trial counsel failed to object to certain improper statements made by the prosecutor during summation.

I.

At trial, the victim testified that, at approximately 4:00 a.m. on March 9, 2008, she returned to her third-floor apartment after work.  While she was unlocking her apartment door, a masked man and defendant (who was unmasked) appeared from a nearby stairwell.  Defendant was brandishing a knife.  The masked man struck the victim on the forehead with a gun, causing her to fall to the floor.  Defendant stepped on the victim's stomach, grabbed the victim's keys and, along with the masked man, dragged the victim into her apartment.  While inside, defendant cut the strap to the victim's purse, dumped the purse's contents and stole money.  Defendant alternated between striking the victim and ransacking the apartment.  At one point, defendant asked the victim if she was "willing to die for Tone"  -- a

reference to Tony Mann, the victim's boyfriend and father of defendant's two children.  The victim was taken by ambulance to a hospital, where she received treatment for cheek and nasal fractures and other injuries to her face and head.  Approximately a week after the incident, the victim picked the defendant out of a line-up and she was thereafter arrested.

The case proceeded to trial.  Prior to voir dire, the court informed the panel that it expected the trial to last approximately five days, and stated that it recognized that for some of the prospective jurors five days may be a hardship because of family obligations or business commitments.  It stated that if any of the prospective jurors had a hardship based on family or business obligations, the court could excuse them from the trial but not from jury duty, meaning that the excused prospective jurors would be returned to the jury room where they could be assigned to another case.  The court asked those prospective jurors who had such hardships to raise their hand and directed them to the center aisle, at which point, the court apprised them that "[t]he clerk will speak to you about your hardship."

After those prospective jurors exited the courtroom, the court provided the remaining prospective jurors with a general synopsis of the charges that were brought against defendant, along with a general statement concerning the People's allegations and the defendant's alibi defense.  The court then

asked the remaining prospective jurors if any of them did not believe that they could be a fair and impartial juror. After excusing a couple prospective jurors, the court began the process of formal voir dire, which involved calling 16 names at random from the remaining prospective jurors and directing them to the jury box. Following questioning by the court and the attorneys, a jury was empaneled and sworn in.

The People thereafter presented their case, the theory of which was that defendant, jealous at having been left by Mann with whom she'd had two children, sought revenge against the victim. In her defense, defendant called three alibi witnesses, all of whom testified that defendant had returned home at 1:00 a.m. the day of the incident and remained there. Defendant also unsuccessfully sought to introduce third-party culpability evidence indicating that two men who were upset with Mann over a drug dispute, rather than defendant, had a motive for attacking the victim and burglarizing her apartment.

During summation, defense counsel attacked the credibility of the People's witnesses, including the victim, and steadfastly maintained that defendant's alibi defense had created reasonable doubt. The prosecutor argued in his summation that the case was about "jealousy" and "obsession" and "hell have [sic] no fury as a woman's scorn [sic]." He posited that "[o]nly a woman would inflict this kind of beating. Only a woman who is trying to maim and disfigure her rival . . . would cause this

kind of injury," and that "[t]his crime is a woman.  That's why she did it at [the victim's] house" by laying in wait on the stairs and "toying with her rival."[1]  Defense counsel did not object to any of these statements.

The jury convicted defendant of burglary in the first degree and assault in the second degree.  Defendant was sentenced to a concurrent term of nine years' imprisonment and five years' post-release supervision on the burglary conviction, and seven years' imprisonment and three years' post-release supervision on the assault conviction.

The Appellate Division affirmed in a 3-1 decision, holding, as relevant here, that defendant failed to preserve her contention that the trial court improperly discharged potential jurors based upon hardship without first conducting a sufficient inquiry, that the trial court correctly precluded as speculative so-called third-party culpability evidence and that, although certain of the prosecutor's summation statements improperly included gender stereotyping, the comments did not deprive defendant of a fair trial (110 AD3d 1005, 1006-1007 [2d Dept 2013]).  The dissenting Justice would have reversed the judgment and ordered a new trial in the interest of justice on the ground

---

[1]  The prosecutor also called into question defendant's alibi defense by claiming that the defendant made "a desperate attempt" to provide alibi witnesses at the last minute, but the trial court interjected that the defense had in fact served a notice of alibi prior to trial, such that it was no surprise to the prosecution when the alibi defense was presented at trial.

that the prosecution's summation comments improperly appealed to gender bias and that certain comments that attacked defendant's alibi defense as having been devised in the last minute were unsupported by the record (see id. at 1007-1008 [Hinds-Radix, J., dissenting]).

A Judge of this Court granted defendant leave to appeal and we now affirm.

II.

Defendant first contends that the trial court abdicated its judicial function by allowing prospective jurors to opt out of serving on the jury due to a hardship and delegated that function to the clerk and the prospective jurors. Defendant acknowledges that trial counsel failed to object to the court's procedure, so the issue presented is whether the court, assuming that the procedure was error in the first place, committed a mode of proceedings error that deprived defendant of her right to a jury trial under the supervision of a judge.

This Court may reach unpreserved questions of law "in a very narrow category of cases" where the errors "go to the essential validity of the process and are so fundamental that the entire trial is irreparably tainted" (People v Kelly, 5 NY3d 116, 119-120 [2005]; see People v Ahmed, 66 NY2d 307 [1985], rearg denied 67 NY2d 647 [1986]). Errors contained in this "tightly circumscribed class" do not require preservation (Kelly, 5 NY3d at 120). We found such an error in Ahmed, where the trial judge

absented himself and had delegated certain functions to the law secretary during jury deliberations (see Ahmed, 66 NY2d at 310). We concluded that an issue of law was presented for our review, notwithstanding the defendant's failure to timely object to the procedure, because the trial judge's "failure . . . to retain control of deliberations" implicated "the organization of the court or the mode of proceedings prescribed by law" (id. [citation omitted]). Upon reaching the merits, we held that the actions of the trial judge, including his delegation of certain responsibilities to his law secretary, "deprived defendant of his right to a proper trial by jury" (id. at 311).

Years later in People v Toliver (89 NY2d 843 [1996]), we acknowledged that "[t]he presence of and supervision by a Judge constitutes an integral component of the right to a jury trial" (id. at 844, citing Ahmed, 66 NY2d at 311-312). In Toliver, the trial judge absented himself from portions of the actual voir dire examination of the jurors and questioning by the attorneys. We held that this absence violated the defendant's "fundamental right to have a Judge preside over and supervise the voir dire proceedings while prospective jurors are being questioned regarding their qualifications," and that the trial judge's relinquishment of control over the proceedings or delegation of the duty to supervise deprived defendant of his right to a jury trial (Toliver, 89 NY2d at 844 [emphasis supplied]). The trial judge's absence from actual voir dire

constituted reversible error because "it is the Judge who is the ultimate arbiter of a prospective juror's fitness to serve" (id. at 845, citing CPL 270.20 [entitled, "Trial jury; challenge for cause of an individual juror"]).

Relying primarily on Ahmed and Toliver, defendant asserts that she was deprived of her right to have a judge "supervise" the process over which prospective jurors are excused for purposes of hardship, such that no objection to the procedure was required. We disagree.

There are significant distinctions between this appeal and Ahmed and Toliver. The mode of proceedings error in Ahmed was the court's "failure . . . to retain control of deliberations," which we held impacted the defendant's constitutional right to a trial by jury (Ahmed, 66 NY2d at 310). Indeed, we later acknowledged that the procedure utilized by the trial court in Ahmed constituted a "fundamental flaw[]" in the proceedings that did not require an objection (People v Becoats, 17 NY3d 643, 651 [2011], cert denied 132 SCt 1970 [2012]).

Toliver is easily distinguishable from the present case because, first and foremost, it is not a mode of proceedings case,[2] because defense counsel registered an objection to the

---

[2] In Toliver, defense counsel registered an objection on the record to the fact that the trial judge had absented himself while prospective jurors two through six were orally answering a questionnaire, and also absented himself for all but the last five minutes of the prosecutor's voir dire, calling it a "delegation of judicial responsibility . . ." (212 AD2d 346,

procedure employed by the trial judge.  Moreover, we reversed in
Toliver on the ground that the trial judge's absence deprived the
defendant of his right to a jury trial because it is the trial
judge who makes the ultimate determination regarding a
prospective juror's fitness to serve (see Toliver, 89 NY2d at
845).

Here, the questioning concerning the prospective
jurors' fitness to serve had not yet begun when the court brought
up the issue of hardship.  The trial court's hardship questioning
occurred before formal voir dire (see CPL 270.15), and focused on
matters that were extraneous to their fitness to serve and might
have led to a prospective juror's inability to serve because of
work commitments and family obligations.  To find otherwise, in
reliance on CPL 270.15, would be to conflate a prospective
juror's inability to serve because of hardship unrelated to
"fitness."[3]

---

347-348 [1st Dept 1995], revd 89 NY 843).

[3]  In support of its contention that a procedure "similar"
to the trial court's procedure in this case has previously been
"struck down" as "improper" (dissenting op, at 9), the dissent
relies on People v Roblee (70 AD3d 225 [3d Dept 2009])--a case
where the defendant was charged with the assault of his
girlfriend.  Roblee is distinguishable, however, because the
Appellate Division in that case concluded that the trial court's
blanket exclusion of prospective jurors who had been accused or
convicted of domestic violence, or any crime, deprived the
defendant of his right to have the jury "'selected at random from
a fair cross section of the community'" (id. at 228, quoting
Judiciary Law § 500).  In addition, the defense attorney in
Roblee specifically objected to the court's procedure (see
Roblee, 70 AD3d at 229).  Finally, the court's improper procedure

CPL 270.15 expressly mandates that the trial court direct that the names of at least twelve members of the panel be drawn and called, at which time those members "shall take their places in the jury box and shall be immediately sworn to answer truthfully questions asked them relative to their qualifications to serve as jurors in the action" (CPL 270.15 [1] [a]).  We have made it clear that once formal voir dire is commenced, the defendant has a fundamental right to have it overseen by a judge (see Toliver, 89 NY2d at 844).

Contrary to the dissent's contention that the court's procedure deviated from CPL 270.15 (1) (a) (dissenting op, at 8), formal voir dire had not commenced in this case when the court inquired of the prospective jurors as to whether they had any hardship.  The trial court simply asked the prospective jurors -- none of whom had their names drawn or were called to the jury box -- if they believed that they would be unable to serve because of a hardship.  At that point, there had been no inquiry into whether these particular prospective jurors were fit to serve as fair and impartial jurors (see CPL 270.15 [1] [a], [b], [c]); CPL 270.20); rather, the only inquiry by the court was whether, given the length of the trial, any particular hardship would prevent them from serving.  Thus, while a defendant possesses a "fundamental right" to have a judge supervise formal voir dire to

in Roblee addressed the prospective jurors' fitness to serve (see CPL 270.15), as opposed to hardship (see Roblee, 70 AD3d at 229-230).

determine a prospective juror's fitness to serve (see Toliver, 89 NY2d at 844), a defendant does not possess a "fundamental right" to have a judge oversee whether a prospective juror has issues in his or her life that prevent them from sitting.  This is evidenced by the fact that both the trial judge and the commissioner of jurors possess the authority to determine whether "attendance for jury service in accordance with the summons would cause undue hardship or extreme inconvenience" to the prospective juror (Judiciary Law § 517 [c]; see 22 NYCRR 128.6-a [granting the commissioner of jurors the discretion to excuse prospective jurors from service and to grant postponements]).

We have acknowledged in a related context that a trial court's consideration of a prospective juror's request to be excused, which is made before the commencement of formal voir dire, is not a material stage of the trial proceedings and the defendant's presence is therefore not required (see People v Velasco, 77 NY2d 469, 473 [1991]).  If a defendant's presence at a trial court's questioning of a prospective juror to determine hardship does not constitute a material stage of the trial, it follows that the procedure employed by the trial court in this instance did not affect the organization of the court or the mode of proceedings prescribed by law.  As such, defendant was required to preserve her objection to the trial court's procedure.

Nor can it be said that the trial court "delegated" an

exclusive judicial function to the clerk.  Judiciary Law § 517 (c) grants to the commissioner of jurors or the court, in deciding whether an application for excusal should be granted, the authority to "consider whether the applicant has a mental or physical condition that causes him or her to be incapable of performing jury service or there is any other fact [which] indicates that attendance for jury service in accordance with the summons would cause undue hardship or extreme inconvenience to the applicant . . ."

Defendant's right to a trial by jury was not impaired by this procedure.  At most, the trial court failed to adhere to a statutory procedural protection; it did not relieve defendant of her obligation to object to the court's procedure (see Kelly, 5 NY3d at 120; see also People v Casanova, 62 AD3d 88, 92 [1st Dept 2009], lv denied 12 NY3d 852 [2009] [holding that pre-screening procedure for hardship did not fall within the mode of proceedings error exception]). Preservation is particularly important in a case like this because the defense, faced with the prospect that certain prospective jurors were claiming that they were unable to serve due to hardship, may very well have made a strategic decision not to challenge the procedure because he did not want to risk having those prospective jurors end up on the jury when it became apparent that they did not wish to serve.  If defense counsel had an objection to the procedure employed by the trial court, he should have voiced it so that the court could

have corrected any alleged error.

                              III.

          Defendant's second contention is that the trial court
committed reversible error when it precluded her from introducing
evidence that she claimed demonstrated that people other than
defendant committed the crimes.  She sought to introduce
testimony from a witness named "LeShay," who was expected to
testify that ten days prior to the burglary and assault, two men
approached her and LeShay.  One of the men purportedly told them
that "Tone" had beat him up for "kilograms," and that it must
have been the victim who had "set him up to be robbed by Tone."

          After the People rested, defense counsel argued that he
intended to call LeShay, who would testify that the two men
approached defendant and LeShay and said, "look, Tony Mann stole
our narcotics, we can't get at Tony Mann because Tony Mann is in
jail, but we can get at you."  The trial court refused to allow
the testimony, finding it to be hearsay, not probative and too
speculative to demonstrate that the two men were involved in the
attack.  The Appellate Division affirmed on those grounds (110
AD3d at 1006).

          Before a trial court permits evidence that another
party committed the crime for which a defendant is on trial, "the
court must balance the probity of the evidence against the
prejudicial effect to the People" (People v Schulz, 4 NY3d 521,
528 [2005], citing People v Primo, 96 NY2d 351, 356 [2001]).  The

admission of such evidence "may not rest on mere suspicion or surmise" (Primo, 96 NY2d at 357).  Here, it cannot be said that the trial court abused its discretion in not allowing the proffered testimony.

                                  IV.

          Defendant's final argument is that she was deprived of the effective assistance of counsel because her trial counsel failed to object to the prosecutor's comments on summation that appealed to gender bias and denigrated defendant's alibi defense. "In order to sustain a claim of ineffective assistance of counsel, New York courts must examine the trial as a whole to determine whether defendant was afforded meaningful representation" (Schulz, 4 NY3d at 530, citing People v Benevento, 91 NY2d 708, 713 [1998]).  "So long as the evidence, the law and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met" (People v Baldi, 54 NY2d 137, 147 [1981]).

          The Appellate Division majority and dissenting Justice were in agreement that the prosecutor's remarks concerning defendant's gender were patently improper, but these observations were made in the context of defendant's (unpreserved) argument that prosecutorial misconduct deprived her of a fair trial.  The dissenting Justice would have reached the issue in the interest

of justice (110 AD3d at 1006-1008).  Nonetheless, defendant raised her ineffective assistance of counsel claim on direct appeal, and we therefore review it here.

Addressing first defendant's contention that defense counsel was ineffective by failing to object to the prosecutor's alleged denigration of defendant's alibi defense, we note that the court interrupted the prosecutor after he made the allegation that certain defense witnesses had not come forward until the day before.  The court explained that defendant had served notice of the alibi defense prior to trial and that the People were not surprised when the alibi witnesses testified on defendant's behalf.  The court explained that defense counsel was not required to mention the alibi witnesses during his opening, and that defendant was not required to present any evidence at trial. The trial court's curative instruction -- which it gave on its own volition -- alleviated any prejudice to defendant and conveyed to the jury that alibi witnesses did not come forward at the last minute.

Turning to defendant's next contention, we conclude that the prosecutor's appeal to defendant's gender was inexcusable and irrelevant, particularly since jealousy and rage are emotions shared by both genders.  Statements such as "only a woman would inflict this kind of beating," "[t]his crime is a woman" and "hell hath no fury as a woman scorned" are simply ridiculous comments since men are equally capable of committing

crimes in a jealous rage.  We therefore agree with defendant that the remarks were inflammatory and were improper summation.[4]  Our decision should not be interpreted as countenancing such summation remarks that appeal to gender stereotypes when objections are raised, and trial courts should reprimand counsel for making such remarks.

That being said, defense counsel's failure to object during summation did not amount to ineffective assistance of counsel such that a new trial is required.  The remarks by the prosecutor were so over the top and ridiculous that defense counsel may very well have made a strategic decision not to object to the inflammatory comments out of a reasonable belief that the jury would be alienated by the prosecutor's boorish comments.  Defense counsel presented an alibi defense, attacked the credibility of the People's witnesses, sought to introduce third-party culpability evidence (albeit unsuccessfully), and pointed out the lack of forensic evidence tying defendant to the crime.  Thus, it cannot be said that defendant did not receive meaningful representation.

---

[4]  The overall thrust of the People's theory on summation -- that defendant was jealous of the victim's relationship with Tony Mann and the crime was perpetrated by a jealous person (as opposed to a stranger, which was the defense's theory) -- was entirely proper in light of the People's evidence.  That evidence was that defendant had harassed the victim over the telephone for several months, and that seven months before the incident at issue on this appeal, defendant physically attacked the victim because of the victim's relationship with Mann.

Accordingly, the order of the Appellate Division should be affirmed.

People v Urselina King

No. 10

RIVERA, J.(dissenting):

I agree with the majority that defendant's third-party culpability claim is without merit.  However, I would reverse the Appellate Division on the grounds that the jury selection process employed by the judge violated the defendant's right to a trial by jury, and defendant was denied a fair trial due to her defense counsel's failure to object to the prosecution's inflammatory, irrelevant, and prejudicial gender-based summation comments. Therefore, I dissent.

### I. IMPROPER DELEGATION OF A JUDICIAL FUNCTION

Defendant challenges the trial judge's jury selection procedure of permitting prospective jurors to self-excuse from jury service on hardship grounds.  On the threshold preservation question, defendant claims that counsel's failure to object is no bar to our review of her claim because the challenged procedure excluded the judge from an integral part of the defendant's criminal trial, in violation of her constitutional right to trial by jury, and therefore constitutes a mode of proceeding error. These arguments find support in our case law and applicable statutes.

- 1 -

A mode of proceedings error is one that "affects 'the organization of the court or the mode of proceedings pr[e]scribed by law'" (People v Walston, 23 NY3d 986, 991 [2014], quoting People v Patterson, 39 NY2d 288, 295 [1976]).  It is "a 'very narrow exception' to the rule that errors made by a trial court may not be raised on appeal unless they are preserved at trial by timely objection" (id.) and is "reserved for the most fundamental flaws" (People v Becoats, 17 NY3d 643, 651 [2011]).  A judge's delegation of judicial oversight of a criminal trial may impact a defendant's constitutional rights and thus fall within the narrow exception to our preservation rule (People v Ahmed, 66 NY2d 307, 310 [1985]).

This Court has made abundantly clear that "[t]he presence of and supervision by a Judge constitutes an integral component of the right to a jury trial" (People v Toliver, 89 NY2d 843, 844 [1996], citing Ahmed, 66 NY2d at 311-312; People v Torres, 72 NY2d 1007, 1008-1009 [1996]).

> "Since the selection of the jury is part of the criminal trial . . . a defendant has a fundamental right to have a Judge preside over and supervise the voir dire proceedings while prospective jurors are being questioned regarding their qualifications.  A Judge who relinquishes control over the proceedings or delegates the duty to supervise deprives a defendant of the right to a trial by jury, requiring reversal"

(Toliver, 89 NY2d at 844 [internal citations omitted], citing People v Velasco, 77 NY2d 469, 472 [1991]; People v Mullen, 44 NY2d 1, 4 [1978]).  Moreover, general questioning that leads to

"the determination that a prospective juror [i]s disqualified before voir dire [i]s a matter for the court" (<u>Velasco</u>, 77 NY2d at 473).  Based on these cases, in accordance with our recognition of the "constitutional guarantee of trial by jury" (<u>Ahmed</u>, 66 NY2d at 310) and a defendant's fundamental right to judicial oversight of jury selection, a judge's failure to supervise questioning of prospective jurors regarding lawful hardship grounds for exclusion from the petit jury, such as occurred here, constitutes a mode of proceedings error that is reviewable by this Court, notwithstanding counsel's failure to object.

The majority concludes otherwise because, according to my colleagues, the defendant's right to a trial by jury was not impaired by the procedure complained of since the hardship question posed by the judge preceded questioning regarding the jurors' fitness to serve and formal voir dire (maj opn at 10). The distinction drawn by the majority is meaningless and contrary to prior case law, which establishes that the duty to control jury selection attaches before the commencement of voir dire and includes determinations about the ability to serve (<u>Velasco</u>, 77 NY2d at 473 [1991] ["determination that a prospective juror was disqualified before voir dire was a matter for the court"]; <u>People v Stiggins</u>, 1 NY3d 529, 530 [2003] [prosecutor's assistance to the judge throughout the jury selection, including prior to voir dire, "resulted in the judge 'relinquish(ing)

control' over the jury selection process"] [modification in the
original]).

Regardless of whether the issue before the court is a
prospective juror's "fitness to serve" or a hardship excuse, and
whether the questions are posed before or during voir dire, what
matters is whether the judge is absented from questioning
designed to lead to the judge's determination of whether a
prospective juror should be relieved from service on defendant's
jury.  A judge's failure to supervise such questioning impacts a
defendant's right to a jury trial, and, as such, implicates the
mode of proceedings prescribed by law.

By way of example we need only consider a comparison of the
procedure followed here to that in People v Velasco.  In Velasco,
after the jury panel was sworn en masse, the judge asked general
questions of the prospective jurors "designed to search out
matters which might lead to disqualification, including physical
impairments, family obligations, and work commitments" (77 NY2d
at 472-473).  The judge then allowed those prospective jurors
wishing to respond to approach the bench and discuss the matter
with the judge, in the presence of the prosecutor and defense
counsel.  This Court acknowledged the propriety of this process
and the trial court's ultimate decision-making role in jury
selection (id. at 473).  As the Court has since noted, Velasco
involved questions "relating only to the qualifications of jurors
in the general sense--questions concerning such matters as

physical impairments, family obligations, and work commitments" (People v Sloan, 79 NY2d 386, 392 [1992]).  Upon consideration of those questions, the Velasco Court "pointed out that the decisions of whether to excuse jurors on the grounds explored by such pre-voir dire screening were matters solely for the court" (id. at 392; Velasco, 77 NY2d at 473).

The procedure adopted by the Court in defendant's case is dissimilar to that followed in Velasco in significant, and, for purposes of our review of defendant's appeal, ultimately determinative ways.  As the record establishes, the judge began the jury selection process by telling the prospective jurors the name of the case and describing jury selection as a process by which the judge and attorneys ask questions of prospective jurors.  The judge stated that "to begin this process of asking you questions and getting truthful answers from you the law requires that you swear or affirm to answer those questions truthfully."  The clerk then swore in the prospective jurors. The judge continued, introduced the attorneys and counsel, and asked if any prospective jurors knew them.  In discussing the expected length of the trial, the judge broached the matter of potential excusal from service.  He said that he knew the prospective jurors' participation in the trial was a sacrifice, and that for some it "may be a hardship" because of "family obligations" or "business commitments," and that he could excuse individual jurors from participation in defendant's trial on

those hardship grounds.  He then asked those prospective jurors
who believed that jury service would be a hardship to identify
themselves by raising their hands.  The judge directed those with
their hands raised to leave the courtroom and step outside into
the hallway where "the clerk will speak to you about your
hardship."  From the record it is clear that some prospective
jurors raised their hands, went outside, and did not return for
further questioning regarding their potential service on the
petit jury.

Thus, rather than discussing with these prospective jurors
the nature of their claimed hardship--as in Velasco--the judge
permitted off-the-record conversations with a clerk about the
basis for hardship excuses, outside of the judge's presence and
without counsels' participation.  Yet, as our cases establish, a
judge is solely responsible for supervision of jury selection and
may not delegate individual juror qualification determinations
(see Toliver, 89 NY2d at 844; Sloan, 79 NY2d at 392; Velasco, 77
NY2d at 473).

Moreover, under the Judiciary Law and the implementing
regulations, a judge is statutorily obligated to make
individualized hardship assessments and cannot grant a
prospective juror's application to be excused without giving some
consideration to the juror's reasons for the request.  Judiciary
Law § 517 provides that a judge may exercise discretion to excuse
a juror from service.  In determining whether to grant excusal

from jury service on hardship grounds, a judge "shall consider whether . . . there is any other fact which indicates that attendance for jury service in accordance with the summons would cause undue hardship or extreme inconvenience to the applicant, a person under his or her care or supervision, or the public," and shall be guided by standards promulgated by the Chief Administrator of the Courts (Judiciary Law § 517 [c]).  Those standards provide a nonexhaustive, suggested list of categories of permissible excuses, such as service as a caregiver, financial hardship, and matters of conscious (22 NYCRR § 128.6-a [II] [B]).  These categories by their nature require some inquiry from the judge as to the underlying facts of the applicant's request.  Thus, by the plain language of the Judiciary Law and the administrative regulatory standards, a determination to grant a hardship excuse requires judicial exercise of discretion based on consideration of the individual prospective juror's circumstances.

The majority misconstrues Judiciary Law § 517 in support of its erroneous conclusion that the judge did not delegate an exclusive judicial function to a clerk (maj opn at 11).  Under the majority's analysis defendant does not have a fundamental right to judicial oversight of hardship determinations because the law permits a trial judge as well as the commissioner of jurors to grant requests to be excused from jury service for hardship (maj opn at 10-11).  This ignores the simple fact that

once the prospective jurors are brought before the judge, it is the judge who decides the application for a hardship excuse from service in defendant's trial specifically (CPL 270.15 [1] [a]; Velasco, 77 NY2d at 473). As the record establishes, the judge in defendant's case understood this was the nature of his authority as he alerted the prospective jurors that he was able to excuse them "from this trial." In exercising that authority, the judge would necessarily base the hardship determination on a prospective juror's personal situation, which could be affected by factors relevant to the particulars of defendant's case, such as the expected length of the trial. Nothing in the law suggests that the commissioner has authority to supplant or supercede the judge's determination, or that the judge's decision is any less "a matter for the court."

The procedure followed in defendant's case also deviated from the procedure set forth in CPL 270.15 (1) (a), which concerns the examination of prospective jurors. Under that provision, no less than 12 persons shall be seated in the jury box and "immediately sworn to answer truthfully questions asked them relative to their qualifications to serve as jurors in the action." Here, the judge swore in the prospective jurors before seating any person in the jury box. Moreover, CPL 270.15 (1) (a) requires that the judge make inquiries of the seated jurors about any fact relevant to their prospective jury service, and permits the judge to use a questionnaire to gather information for this

purpose.  The questionnaire responses are also provided to each attorney. Counsel thereafter has the opportunity to examine the prospective jurors.  Thus, in accordance with this procedure, once the judge swears in a prospective juror, the judge makes general inquiries, followed by more specific questions as necessary, counsel has access to that information, there may be questioning by counsel, and then the court makes the final determination about the prospective juror's ability to serve on a defendant's jury.  It may well be that the judge accepts the juror's hardship ground, but a blanket hardship excuse without judicial consideration is not provided for by our laws.

Indeed, the Third Department in People v Roblee (70 AD3d 225, 229 [3d Dept 2009]) struck down as improper a pre-voir dire selection procedure similar to that adopted in defendant's case. In Roblee, the court asked a group of prospective jurors to raise their hands if one of a number of disqualifying conditions applied to them: they had a serious health issue; knew the defendant, defense counsel, District Attorney, or Assistant District Attorneys involved in the case; if they, or a close friend or relative had been accused, convicted, or the victim of domestic violence or any other crime; or if they had immediate reasons, personal or business, which would keep them from serving as jurors.  The court informed the prospective jurors that it and the parties would speak with anyone who raised their hands, but the court first asked those who had identified themselves to step

aside, with the provision that they would be called back if they were needed.  However, voir dire was concluded without recalling or speaking further with those prospective jurors (id.).  As the Third Department noted, "[t]he proper practice would be for the court to immediately follow up with those potential jurors to identify their specific problems and determine whether those individuals should remain in the pool or be excused" (id., citing People v Henderson, 45 AD3d 903, 904 [2007]; People v Gayle, 238 AD2d 133, 133-134 [1997], lv denied 90 NY2d 893 [1997]; Judiciary Law § 518).

As we have previously held, the fact that counsel may have consented, either affirmatively or by failing to object, does not constitute a waiver of the instant challenge to the judge's procedure.  Instead, to effectuate a valid waiver of the right to a trial by jury, a defendant must sign a written waiver "in person in open court in the presence of the court, and with the approval of the court" as required by CPL 320.10 (2) (Ahmed, 66 NY2d at 311 [internal quotation marks omitted], citing CPL 320.10 [2]).

In addition to constituting a violation of the defendant's constitutional right to trial, the judge's practice resulted in a jury constituted in violation of this State's policy that "all litigants in the courts of this state entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community ... and that all

eligible citizens ... shall have an obligation to serve when summoned for that purpose, unless excused" (Judiciary Law § 500). Even if service seems unjust because of the sacrifice involved "it is necessary as long as we are to persist in our cherished belief that an accused felon is entitled to be tried by a jury of . . . peers" (People v Michael, 48 NY2d 1, 10 [1979]). The United States Supreme Court likewise has recognized that "[j]ury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience" (Thiel v S. Pac. Co., 328 US 217, 224 [1946]).

Under the circumstances presented in defendant's case, I would find that the judge committed a mode of proceedings error when he abdicated his role in supervising the questioning that would serve as the basis for a determination on whether any of the prospective jurors should be excused on the grounds of hardship. Whereas in Velasco the judge was in control of the pre-voir dire screening and relied on the responses solicited during that procedure to make a judicial determination on the individual prospective jurors' ability to serve, here the judge wholly relinquished his supervisory role to a clerk after inviting prospective jurors to assess the existence of a personal hardship warranting excusal from service on defendant's jury. That procedure is impermissible and violated the defendant's right to a jury trial. Harmless error analysis is inapplicable (People v Anderson, 70 NY2d 729, 730-731 [1987]; Hildreth v City

of Troy, 101 NY 234, 239), and the violation requires reversal.


## II.   INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant's additional claim that she was denied a fair trial because defense counsel was ineffective for failing to object to various inflammatory gender-based comments during the prosecutor's summation provides an alternative ground for reversal.  While not every offensive comment or out-of-bounds remark by a prosecutor on summation, gone unchallenged, will serve to elevate defense counsel's misstep to an error of constitutional proportion, counsel's silence in defendant's case during the prosecutor's summation permitted statements to the jury that were deeply prejudicial to the defense.  The record establishes that in his closing statement the prosecutor relied on gender stereotypes intended to undermine the defendant's case by denigrating the defendant and women as a class, and simultaneously sought to shore up the credibility of the People's sole witness.  No defense strategy could be furthered by the prosecutor's remarks, and therefore defense counsel was ineffective for failing to object.

Under the State standard for ineffective assistance of counsel, in reviewing the representation provided to defendant, the Court must look to counsel's performance in its totality (see People v Baldi, 54 NY2d 137, 147 [1981]), to determine whether defendant received meaningful representation (see People v

Benevento, 91 NY2d 708, 712 [1998]).  Under the more exacting

federal standard, the defendant must establish that counsel's

assistance was deficient and that the errors were prejudicial, in

that they were "so serious as to deprive the defendant of a fair

trial" (Strickland v Washington, 466 US 668, 687 [1984]).  A

claim of ineffectiveness based on

> "[d]efense counsel's inaction in the face of
> prosecutorial misconduct made during closing
> argument is subject to the same 'meaningful
> representation' standard applicable to other
> trial errors.  Under that standard, where
> defense counsel fails to object when faced
> with a pattern of prosecutorial misstatements
> far afield from acceptable argument, such as
> statements that misrepresent evidence central
> to the determination of guilt, and where
> there is no apparent strategic explanation
> for defense counsel's silence, defendant has
> been deprived of meaningful representation
> and the constitutional right to a fair trial"

(People v Wright, 25 NY3d 769, 780 [2015]; see also People v

Fisher, 18 NY3d 964, 967 [2012] ["defense counsel's failure to

object to any, let alone all, of the prosecutor's egregiously

improper departures during summation, particularly in the highly

charged, potentially outcome determinative context in which they

occurred, deprived defendant of the right to effective assistance

of counsel"]).

The majority concludes that "the prosecutor's appeal to

defendant's gender [is] inexcusable and irrelevant," the

statements about the gendered nature of the crime and the

perpetrator "are simply ridiculous comments," and the

prosecutor's "remarks were inflammatory and were improper

summation" (maj opn at 16).  The majority further states that its "decision should not be interpreted as countenancing such summation remarks," and that trial courts "should reprimand counsel for making such remarks" (maj opn at 16).  I agree, and find unfathomable the majority's conclusion that counsel was not ineffective for failing to object to these obviously "inflammatory," "irrelevant," and "ridiculous" comments, that in the future will subject counsel to judicial reprimand.  The sole basis for the majority's conclusion is its speculation that defense counsel may have reasonably believed the prosecutor's remarks would alienate the jury, and counsel's silence was a strategic choice (maj opn at 16).  That conclusion is not plausible given the history of sex discrimination in the justice system, as well as the nature of the summation comments presented in this appeal and their impact on the defense and the People's case.

As a starting point, certain foundational matters should guide this Court's analysis of defendant's claim.  Foremost is the fact that "our Nation has had a long and unfortunate history of sex discrimination" (Frontiero v Richardson, 411 US 677, 685 [1973]), and that inequality based on gender was often legally sanctioned (see e.g. Nevada Dept. of Human Resources v Hibbs, 538 US 721, 729 [2003] ["The history of the many state laws limiting women's employment opportunities is chronicled in--and, until relatively recently, was sanctioned by--this Court's own

opinions"]; United States v Virginia, 518 US 515, 531 [1996] ["Through a century plus three decades and more of that history, women did not count among voters composing 'We the People'; not until 1920 did women gain a constitutional right to the franchise. And for a half century thereafter, it remained the prevailing doctrine that government, both federal and state, could withhold from women opportunities accorded men so long as any 'basis in reason' could be conceived for the discrimination."] [internal citations omitted]; Martha Chamallas, *The Architecture of Bias: Deep Structures in Tort Law*, 146 U. Pa. Law Rev. 463, 463 nn 1, 2 [historically, only men could sue for loss of consortium or loss of a child's services]).

Over time society's appreciation of this history and its impact on society and individuals has only deepened.  The enduring role of gender stereotypes and bias reminds us that it is not so easy to ignore over a century of discrimination.  We do not simply wake up one morning to find, as if by magic, that our communities are gender bias-free, and that individuals and the collective population have been able to cleanse the taint of discrimination.  Rather, gendered perceptions of women's roles and abilities continue to plague workplaces, homes, and our justice system (see e.g. Burlington N. and Santa Fe Ry. Co. v White, 548 US 53, 70 [2006] [reassignment of plaintiff to less-desirable job duties and 37 days of suspension without pay sufficed to support a claim for retaliation under Title VII for

plaintiff's reporting of her supervisor's derogatory gender-based comments]; <u>Back v Hastings On Hudson Union Free School Dist.</u>, 365 F3d 107, 120 [2d Cir 2004] ["stereotyping in the view that a woman cannot 'be a good mother' and have a job that requires long hours, or in the statement that a mother who received tenure 'would not show the same level of commitment [she] had shown because [she] had little ones at home,' could establish gender discrimination under the Equal Protection Clause]; <u>Hibbs</u>, 538 US at 736 ["Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. Because employers continued to regard the family as the woman's domain, they often denied men similar accommodations or discouraged them from taking leave."]; <u>see also</u> ABA Presidential Task Force on Gender Equity and the Commission on Women in the Profession, Closing the Gap: A Road Map for Achieving Gender Pay Equity in Law Firm Partner Compensation [2013]; Ronit Dinovitzer, Nancy Reichman, and Joyce Sterling, *The Differential Valuation of Women's Work: A New Look at the Gender Gap in Lawyers' Incomes*, 88 Social Forces 819 [2009]; Molly McDonough, *Damaging Disrespect: Minorities and Women Still Experience Bias in the Justice System, Though It Isn't Always Obvious*, 89 ABA Journal 56 [2003]; The Honorable Dorothy W. Nelson, *Introduction to the Effects of Gender in the Federal Courts: the Final Report of the Ninth Circuit Gender Bias Task Force*, 67 S. Cal. Law Rev. 731 [1994]).

In recognition of the continued presence of sex discrimination in our society, our courts have sought to address inequality in the justice system by addressing gender stereotypes in the courtroom (see e.g. J.E.B. v Alabama ex rel. T.B., 511 US 127, 129 [1994] [declaring that peremptory challenges based on "gender, like race, is an unconstitutional proxy for juror competence and impartiality"]; New York State Judicial Committee on Women in the Courts, Women in the Courts: A Work in Progress [April 2002]; National Judicial Education Program, Gender Fairness in the Courts: Action in the New Millennium [Nov. 1, 2001]).  Those efforts are part of the broader commitment to create courtrooms free of discrimination and bias, and a legal system based on just treatment.

Thus, to ensure a defendant's trial is fair and that prejudice does not affect the outcome, a prosecutor may not rely on stereotypes as part of the People's case.  As a general matter, courts have recognized a prosecutor's summation that "appeal[s] to prejudice and passion . . . violates every basic concept of fair trial" (People v Hearns, 18 AD2d 922, 923 [2d Dept 1963] [prosecutor's summation which emphasized that defendant and two key witnesses were of the same race was impermissible]).  Reliance on impermissible characteristics, "impermissibly alter[s] the jurors' view of both the [defendant] and the issues" (Glenn v Bartlette, 1996 WL 648679, *9 [NDNY Oct. 31, 1996] [prosecutor's introduction of race to the proceedings

in combination with other violations necessitated the grant of habeas corpus and a new trial], affd sub nom. Glenn v Bartlett, 98 F3d 721 [2d Cir 1996]).

While our courts have had occasion to comment specifically on references to race and sexuality in the courtroom, the concerns that underlie those cases are no less applicable to a prosecutor's deployment of stereotypes about women. Thus, judicial considerations of the propriety of those comments, particularly those contained in prosecutor summations, should guide analysis of defendant's case. As those cases instruct, summation grounded in offensive and biased argument "creates the grave danger that jurors will be distracted from evaluating a case strictly on the basis of the evidence presented and will instead approach the evidence from the point of view of biases triggered by racially influenced fears or prejudices" (People v Rivera, 136 AD2d 520, 521 [1st Dept 1988], affd, 73 NY2d 941 [1989]). There is no place in a trial for remarks that attempt to make a connection between defendant's group association and certain criminal activities because those comments "appeal to the fears and prejudices of the jury . . . and [are] designed to sidetrack the issue way from defendant's guilt or innocence" (People v De Vito, 21 AD3d 696, 700 [3d Dept 2005]). Thus, an appeal to the jury based on stereotyping "can serve no purpose other than to arouse racially prejudiced attitudes and to undermine the jury's dispassionate and objective consideration of

the evidence adduced at trial" (<u>People v Thomas</u>, 129 AD2d 596, 597 [2d Dept 1987]).  As such, argument based on stereotype is divisive and "offends the democratic and logical principle that race, creed or nationality, in themselves, provide no reason for believing or disbelieving a witness' testimony" (<u>Hearns</u>, 18 AD2d at 923; <u>see also</u> <u>McFarland v Smith</u>, 611 F2d 414, 416-417 [2d Cir 1979] ["(t)o raise the issue of race is to draw the jury's attention to a characteristic that the Constitution generally commands us to ignore.  Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended"]).

Defendant claims that a competent attorney would have realized that the prosecutor's comments were objectionable and detrimental to the defendant, given the gendered nature of the remarks and their prejudicial impact on her defense.  Defendant asserts that her attorney should have objected to the prosecutor's statements that the case was "about jealousy, it's about rage, it's about obsession. . . . It's about hell have [sic] no fury as a woman's scorn [sic]," that "[o]nly a woman would inflict this kind of beating. Only a woman who is trying as hard as she can to maim and disfigure her rival and to have an avenue for her rage and her jealousy would cause this kind of injury."  She further complains that counsel failed to stop the prosecutor from arguing that it was significant that the attack

took place in the complainant's apartment because "[i]t's a good location for a woman trying to take out her shame and rage and her jealousy on the face of her rival."

The prosecutor's assertions that only a woman could inflict the type of harm evidenced in this case, and that the injury could only be caused by a woman trying to disfigure her rival, were statements grounded in unfounded gender stereotypes which, as the majority concedes, were improper summation (maj opn at 16). As the record establishes, the prosecutor exhorted the jurors to rely on gender stereotypes of vengeful spurned women and argued without any record evidence that the crimes could only be committed by a woman, but not just any woman. The prosecutor claimed that the crime had to have been committed by a particular type of woman, namely a scorned woman who would do anything against another who was romantically involved with her man. Of course, these stereotypes have no grounding in fact and certainly not in any evidence placed before the jury during the trial. As the majority acknowledges, these types of remarks are "inflammatory" and "simply ridiculous" (maj opn at 16).

However, the comments are impermissible not solely because they are offensive, but because they associate particular criminal conduct with a defining group characteristic specific to defendant, namely her gender. Courts have rejected affinity group classifications because of their potential impact on the ultimate determination of guilt (<u>United States v Rodriquez</u>

Cortes, 949 F2d 532, 541-542 [1st Cir 1991] [error to admit identification care showing defendant to be Colombian as "the effect . . . was to allow the jury to determine guilt based on (defendant's) supposed nationality"]; United States v Doe, 903 F2d 16, 21-22 [DC Cir 1990] ["It is much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case."]; Carter v Rafferty, 621 F Supp 533, 546 [DNJ 1985] ["The prosecutor, . . . without basis in the record, imputed the 'powerful motive of revenge' on the entire black community, and thus on the petitioners. This despite the absence of any evidence of either petitioner having such racial hatred."], affd in part, appeal dismissed in part, 826 F2d 1299 [3d Cir 1987]).

Moreover, because defendant presented an alibi defense, the case came down to a credibility determination, requiring the jury to decide whether to believe the complainant or defendant.  Thus the prosecutor's comments that sought to paint defendant as a violent harpy and the complainant as a vulnerable and stalked woman, were designed to make defendant appear less believable while also enhancing the complainant's credibility.  One of the most difficult stereotypes to unsettle is that of the weak, desperate, needy, helpless woman.  Part of the prosecutor's summation relied on that stereotype to make the complainant sympathetic and more credible to the jury.  The prosecutor asked the jury to

> "[i]magine what [the victim] must have felt
> the first time she looked at herself in the
> hospital mirror. Every one of those blows,
> with the exception of her hand, where she got
> stepped on and her stomach, where she was
> stood on, before she got dragged inside the
> apartment, to her face, her hair, her head.
> This crime is a woman [sic]."

The prosecutor contrasted the complainant's weak position to that of the defendant who the prosecutor argued

> "wants to wait until [the complainant] has no
> escape. She can almost get inside the
> apartment. She can almost get down the
> stairs. . . . She is trapped in this tiny
> little landing with the keys in the door. No
> where to run. That's the kind of fear
> [defendant] was trying to put in [the
> complainant's] heart."

Use of gendered stereotypes to enhance the credibility of a witness is impermissible (Rivera, 136 AD2d at 521; Hearns, 18 AD2d at 923; McFarland v Smith, 611 F2D 414, 419 [2d Cir 1979] ["The credibility of the state's witness[] should depend on an assessment of many pertinent factors, but the state should not be entitled to have its witness's credibility enhanced simply because they are not members of a group that might be prejudiced against the defendant."]).  All the more so where the case turns on the credibility of the sole witness (People v Robinson, 17 NY3d 868, 870 [2011]).

No defense strategy explains allowing without objection this double harm to the defense, not even the strategy identified by the majority, namely that the prosecutor's comments were so offensive that they would alienate the jury (maj opn 16-17). This would have been a nonsensical response to the summation

because it allowed the prosecutor to draw from the well of gendered images of women as both vengeful and vulnerable, predator and prey. Moreover, assuming, as the majority does, that the jury might be offended by the prosecutor's comments, that does not mean defendant would gain a tactical advantage. Defendant and the complainant are both women and the jury could just as well have viewed both as mistreated by the prosecutor, allowing the People to draw on the jury's sympathies for the complainant. Thus, whether the jury embraced the stereotypes or rejected them outright, there was a potential upside to be gained for the prosecutor's case, and no disadvantage to objecting.

There is yet another reason to reject the argument that defense counsel made a strategic choice not to challenge the prosecutor's remarks. If the jury was repulsed by the prosecutor's characterizations of women, then by his silence defense counsel risked the appearance that he condoned the remarks, possibly drawing the ire of the jurors. If, instead, he stood up for his female client, he would be viewed no worse by the jury, and perhaps considered more favorably. Therefore, contrary to the majority's opinion, objecting was the *only* proper defense strategy because it would have avoided any negative perceptions of the defendant and her defense counsel and potentially enhanced counsel's standing in the eyes of the jurors.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed.  Opinion by Judge Pigott.  Judges Abdus-Salaam,
Stein and Fahey concur.  Judge Rivera dissents in an opinion.
Chief Judge DiFiore and Judge Garcia took no part.


Decided March 29, 2016